Filed 6/2/21  Marriage of Ostrowski CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re the Marriage of TAMMY and STEPHEN OSTROWSKI. | C087280 |
| TAMMY OSTROWSKI,<br><br>Respondent,<br><br>v.<br><br>STEPHEN OSTROWSKI,<br><br>Appellant. | (Super. Ct. No. FL0046765) |

Stephen Ostrowski appeals from spousal support and property division orders in a judgment of dissolution ending his more than 12-year marriage to Tammy Ostrowski.[1] He contends the trial court erred in (1) denying his Family Code section 2640

---

[1] We refer to the parties by their first names for clarity.

reimbursement claims;[2] (2) fixing the value of Chico Pools, a community property business; (3) concluding that his unilateral closing of Interlinx Marketing (Interlinx) and sale of Hostverse violated the automatic temporary restraining orders (ATROs) in the summons, and assigning the sale amount of Hostverse to him without an adjustment for net losses; (4) imputing an additional $800 in monthly income to him; (5) not modifying the temporary spousal support award retroactive to the date when it first issued the interim order; (6) awarding Tammy $400 in permanent monthly spousal support; and (7) only allowing half of his reimbursement claim for his post-separation payments of a community debt.  Tammy's respondent's brief purports to assert various challenges to the trial court's order as well, including that (8) the trial court erred in allocating PayPal and eBay stocks.

We conclude (1) the trial court did not err in concluding that insufficient evidence supported Stephen's section 2640 claims; (2) substantial evidence supported the trial court's determination about the value of Chico Pools; (3) substantial evidence supported the trial court's finding that Stephen closed Interlinx and sold Hostverse in violation of the ATROs in the summons, and Stephen fails to demonstrate that the remedies for his wrongdoing were improper; (4) the trial court did not abuse its discretion in imputing income to Stephen based on his earning capacity; (5) the trial court did not abuse its discretion in modifying its temporary spousal support order retroactive to the date when Stephen filed a request to modify support; (6) Stephen fails to demonstrate any abuse of discretion in the trial court's consideration of the statutory factors for setting permanent spousal support; (7) Stephen forfeited his appellate claim regarding reimbursement for community debt payments by failing to support the claim with any legal analysis or

---

[2] Undesignated statutory references are to the Family Code.

2

citation to authority; and (8) we do not consider any of the assignments of error asserted in Tammy's respondent's brief because she did not file a cross-appeal.

We will affirm the judgment.

BACKGROUND

Tammy and Stephen were married on February 16, 2002. They separated on November 15, 2014. They had three minor children at the time of separation.

Tammy filed a petition for dissolution of marriage on December 4, 2014, requesting child and spousal support and the determination of property rights, among other things. On May 1, 2015, the trial court issued a temporary family support order requiring Stephen to pay Tammy $3,000 a month in family support. It issued a nearly identical interim order on August 27, 2015.

On August 1, 2017, Stephen filed a request to modify the amount of temporary family support. Tammy asked the trial court to address the issues presented in Stephen's request at trial.

Tammy and Stephen testified at the court trial. Their testimony and pretrial filings established the following:

They bought Chico Pools in March 2002, shortly after marrying, for between $9,000 and $11,000. They agreed Tammy would quit her long-term job at Enloe Medical Center to operate Chico Pools. Tammy operated Chico Pools alone in the beginning, performing administrative and pool-service work herself. Chico Pools had about 15 or 17 clients. In 2007, there were 90 clients and at the time of the trial, there were 51 or 63 clients.

Tammy ceased operating Chico Pools sometime in mid-2003 when she became pregnant. She and Stephen hired someone to service pools while Stephen, who was working for PayPal/eBay, did the accounting work.

Tammy testified that the Chico Pools profit and loss statements Stephen prepared for 2015 through 2017 included personal expenses and did not accurately reflect actual

3

expenses for the business. Stephen agreed the statements included personal expenses. Tammy opined that Stephen could maximize Chico Pools' income by performing the pool-service work himself, instead of using a subcontractor. But Stephen claimed he could not physically perform pool-service work. Tammy opined Chico Pools had a fair market value of $91,666. Stephen valued Chico Pools at between $42,000 and $56,000. He offered to pay Tammy $50,000 for the business.

Tammy and Stephen had three pieces of real property. About one year after marrying, they bought the family residence (the Top Hand Court house) for $270,000 with a $54,000 down payment and a $116,000 loan. Tammy operated Chico Pools and Stephen worked at eBay at that time. According to Tammy, she and Stephen deposited their earnings in joint bank accounts and they used the money in the joint accounts to pay the down payment for the Top Hand Court house. According to Stephen, the down payment came from the sale of his separate, real property.

Tammy and Stephen bought the Magnolia Avenue property on October 8, 2004, also during the marriage, for $225,000 with a $5,000 down payment and $42,150.19 in closing costs. Tammy testified she was not aware of any separate property funds used for the down payment on the Magnolia Avenue property. Stephen testified that the down payment came from the sale of his separate real and personal property.

The closing statement for the purchase of the Top Hand Court house was not presented in evidence; nor was a banking statement, cancelled check or other document to show where the down payment for the Top Hand Court and Magnolia Avenue properties came from. Stephen said he thought Tammy shredded the documents that he had.

Tammy and Stephen earned rental income from the Magnolia Avenue property. They also rented out the West Park Drive property, another community asset. Stephen presented records showing net losses for the Magnolia Avenue and West Park Drive rental properties for the period 2014 to 2017. Tammy opined, based on listings she had

4

seen for rentals, that the Magnolia Avenue and West Park Drive properties were rented at below fair market rates.

Stephen started Interlinx with a partner in 2009. After Tammy had filed the petition for dissolution, Stephen closed Interlinx and sold Hostverse, an asset of Interlinx, in July 2015 for $45,000. Stephen testified that he split the Hostverse sale proceeds with his partner and even with his half share of the proceeds, Interlinx suffered a net loss in 2015. Stephen did not provide notice to Tammy of the closure and sale.

Tammy and Stephen were 52 years old at the time of the trial. Tammy did not work outside the home beginning in mid-2003. After the separation, she worked part-time at an elementary school beginning in August 2015, and was paid an hourly rate of $14.45. She began working as a legal secretary in May 2017. At the time of the trial, she worked 37 hours a week at an hourly rate of $20 or $3,207 a month. The Top Hand Court family residence was over 2,500 square feet; after the separation, Tammy rented a 1,230 square foot townhouse. She paid $1,250 a month in rent and said she was frugal with expenses.

Stephen worked at PayPal when Tammy met him. He was a senior quality assurance engineer earning $100,00 a year. PayPal was later bought by eBay. Stephen left eBay in July 2004. He started a house-flipping business called Help You Own after he left eBay. He obtained a realtor's license and started a real estate auction company between 2004 and 2010. The real estate auction business ended after the 2008 housing crash. He started Interlinx in 2009 and was its product manager. Interlinx created a software product which produced substantial profits for two to three years. In October 2015, after the separation, Stephen started a part-time job as an internet marketer for Swiss Link, Inc., a military surplus company. He reported that at the time of the 2017 trial, he worked 25 hours a week at Swiss Link, Inc. and 16 hours a week at Chico Pools. His average monthly salary from Swiss Link, Inc. was $1,560; his average monthly

5

income from Chico Pools was $2,200. Stephen had not applied for a job nor sought full-time employment since February or March 2015.

Tammy and Stephen's 2013 joint federal income tax return showed a total income of $57,491, primarily from business income. They reported a net profit of $54,950 for Interlinx and $17,663 for Chico Pools. Their joint federal income tax return for 2014 (the year of separation) showed $1,193 in interest and business income and a negative total income of $2,322, after considering losses from rental real estate and other things. They reported $1,047 in net profit for Interlinx and zero net profit or loss for Chico Pools. Stephen's 2015 federal income tax return showed a total income of $12,138. He reported a net loss of $20,662 for Interlinx and a net profit of $23,372 for Chico Pools. His 2016 federal income tax return showed a total income of $19,343. He reported a net loss of $3,680 for Interlinx and a net profit of $20,051 for Chico Pools.

The trial court issued a statement of decision upon Stephen's request. It found Chico Pools was a community property asset valued at $69,313 and awarded the business to Stephen. It concluded that Stephen failed to trace a separate property interest by a preponderance of the evidence to support his claim for section 2640 reimbursements in relation to the Top Hand Court and Magnolia Avenue properties. With regard to Stephen's claim for credit for rental property losses, the trial court credited Stephen one-half of the losses ($11,603.50). The trial court found that Stephen closed Interlinx and sold Hostverse, without Tammy's agreement, in violation of the ATROs in the summons. Consequently, it ordered Stephen to hold Tammy harmless from any liability associated with Interlinx and Hostverse, it attributed the sale proceeds from Hostverse ($22,500) to Stephen, and it assigned Interlinx's losses ($14,439) to Stephen.

The trial court found that Tammy was employed to her capacity based on her education and work experience. It discounted Stephen's representation that he worked 16 hours a week at Chico Pools and credited Tammy's testimony that the work at Chico Pools would take only four hours a week or 20 hours a month, and found that Stephen

6

was underemployed.  It imputed income to Stephen for an additional ten hours a week at a rate of $20 per hour or $800 a month for a total monthly income of $4,560.

The trial court modified the temporary spousal support award to Tammy for the period August 1, 2017 to February 1, 2018, to $0.  It awarded Tammy $400 in permanent monthly spousal support, effective February 1, 2018.  It modified the child support award to Tammy to $218 per month commencing on August 1, 2017.  We will discuss the trial court's findings in further detail *post* where relevant to our discussion.

A judgment of dissolution was entered on May 3, 2018.  Stephen appeals from the judgment.

DISCUSSION

I

Stephen contends the trial court erred in denying his section 2640 reimbursement claims for the down payments he made on the Top Hand Court and Magnolia Avenue properties using his separate property funds.

In dividing the community estate, a party must be reimbursed for his or her contribution to the acquisition of community property to the extent he or she traces the contribution to a separate property source, unless he or she has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver. (§ 2640, subd. (b); *In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1057 [§ 2640 establishes a prima facie statutory right of reimbursement in a marital action dividing the community estate].)  "Contributions to the acquisition of property" include down payments.  (§ 2640, subd. (a).)  Whether a party claiming a separate property interest has adequately met his or her burden of tracing to a separate property source is a question of fact.  (*In re Marriage of Cochran,* at pp. 1057-1058.)  We will uphold a trial court's finding in that regard if it is supported by substantial evidence.  (*In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 274-275; *In re Marriage of Cochran,* at pp. 1057-1058.)

7

The Top Hand Court and Magnolia Avenue properties were purchased during the marriage. Stephen testified that the down payment for the purchase of the Top Hand Court house in 2003 came from the recent sale of his separate real property, and at that time there were no community property funds to pay that down payment. He further testified that he paid the down payment for the purchase of the Magnolia Avenue property in 2004 using, in part, the proceeds from the sale of another separate real property, and at that time he and Tammy did not have community property funds to pay the down payment.

Tammy presented contrary evidence. She testified that she operated Chico Pools and Stephen worked at eBay, they deposited their earnings in joint bank accounts, and they used money in the joint accounts to pay the down payments. She was not aware of any separate property funds used to purchase the Top Hand Court or Magnolia Avenue properties. The trial court credited Tammy's testimony.

Stephen confirmed he worked at PayPal, which was later acquired by eBay, from 1999 or 2000 to July 2004, and he earned $100,000 a year. There was no evidence of the income from Chico Pools in 2003 or 2004. There was also no evidence of Stephen's income from Help You Own, a business he started after he ended his employment with eBay. Stephen did not present documentary evidence tracing the deposit, transfer and/or withdrawal of the separate property funds he claimed he used to make the Top Hand Court and Magnolia Avenue down payments, and there was no evidence that community property funds, such as income from Chico Pools, Help You Own and/or eBay, could not have been used to pay the down payments. (See *In re Marriage of McLain, supra,* 7 Cal.App.5th at pp. 273, 275 [the trial court properly concluded that the husband did not sufficiently trace separate property allegedly used to pay for the construction of a house where no documents were submitted in support of the tracing of funds; husband and wife had more money available, from various sources, than was needed for the construction; and it could not be determined what amount of the husband's separate property funds

8

went toward the construction]; cf. *In re Marriage of Buie and Neighbors* (2009) 179 Cal.App.4th 1170, 1172 [the evidence presented showed a particular car was purchased using a check drawn on the wife's bank account, which held funds derived from the sale of her separate property residence].)

There is a rebuttable presumption that property bought during marriage is community property. (*Estate of Murphy* (1976) 15 Cal.3d 907, 917; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 610-611.) "Evidence which merely establishes the availability of separate funds on particular dates without also showing any disposition of the funds is not sufficient proof of tracing to overcome the presumption in favor of community property." (*Estate of Murphy,* at p. 918; see *In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 330.) Substantial evidence supported the trial court's conclusion that Stephen did not introduce sufficient evidence to trace the source of the funds used to make the down payments on the Top Hand Court and Magnolia Avenue properties. (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823-825 [rejecting § 2640 claim where no records were presented to support reimbursement claim].)

Citing *In re Marriage of Mix*, Stephen contends his testimony that he used separate property funds to pay the down payments for the purchase of the Top Hand Court and Magnolia Avenue properties was sufficient to establish that fact, even though he was unable to produce any bank statements, cancelled checks or wire transfer documents supporting his testimony. But *In re Marriage of Mix* does not help Stephen. To establish the separate character of certain assets, the wife in *In re Marriage of Mix* presented a schedule she and her accountant compiled from her records, which itemized chronologically each source of separate funds, each expenditure for separate property purposes and the balance of separate property funds remaining after each expenditure. (*In re Marriage of Mix, supra,* 14 Cal.3d at p. 613.) The wife could not correlate each itemized deposit and withdrawal on the schedule with a bank account or other supporting record, and the Supreme Court held the schedule by itself was inadequate to trace the

9

alleged separate property. (*Id.* at p. 614.) But the wife also testified that the schedule accurately reflected the receipts and expenditures in various bank accounts and the trial court credited her testimony that she used separate property funds, which were deposited into commingled accounts, to pay separate property expenditures. (*Ibid.*)

Here, unlike in *In re Marriage of Mix*, Stephen did not present a schedule showing receipts and expenditures of separate property funds and the trial court did not credit his testimony that he used separate funds to make the down payments for the purchase of the Top Hand Court and Magnolia Avenue properties or that Tammy shredded the documents he needed to prove his claim. "[I]t is the province of the trial court to assess credibility of witnesses and resolve conflicts in evidence." (*In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1016.) We are bound by the trial court's credibility determinations and do not reweigh the evidence. (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94.) " 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" ' " (*Ibid.*) In a substantial evidence challenge to a judgment, as here, we consider all of the evidence in the light most favorable to the prevailing party and resolve conflicts in support of the trial court's findings. (*Ibid.*)

II

Stephen next argues the trial court erred in fixing the value of Chico Pools.

A "trial court possesses broad discretion to determine the value of community assets as long as its determination is within the range of the evidence presented. [Citation.] The valuation of a particular asset is a factual question for the trial court, and its determination will be upheld on appeal if supported by substantial evidence in the record." (*In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670; see *In re Marriage of Iredale & Cates* (2004) 121 Cal.App.4th 321, 329.)

10

A trial court must determine the fair market value of the community estate when assets are not divided in kind. (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 88.) "[T]he fair market value of a marketable asset in marital dissolution cases is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no obligation or urgent necessity to do so, and a buyer, being ready, willing and able to buy but under no particular necessity for so doing." (*Id.* at p. 89.) The value of property may be shown by the opinion of an owner of the property being valued. (Evid. Code, § 813, subd. (a)(2); *In re Marriage of Hargrave* (1985) 163 Cal.App.3d 346, 351.) The opinion of a witness as to the value of property must be based on matter perceived by or personally known to the witness or made known to the witness at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion as to the value of property, unless a witness is precluded by law from using such matter as a basis for an opinion. (Evid. Code, § 814.) " 'The credit and weight to be given such evidence and its effect . . . is for the trier of fact.' " (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921.)

Neither party called an expert witness regarding the value of Chico Pools. Instead, Tammy and Stephen provided their own opinions regarding value. Tammy testified Chico Pools had a fair market value of $91,666. Stephen opined Chico Pools had a value of $50,000. The trial court valued Chico Pools at $69,313. That value was determined by multiplying Chico Pools' 2016 gross monthly income ($83,176 ÷ 12 = $6,931.33) by 10. We conclude the trial court's finding was within the range of the evidence presented.

Stephen's 2013 through 2016 federal income tax returns showed Chico Pools consistently earned a gross annual income exceeding $82,000. Stephen's 2016 federal income tax return showed Chico Pools' gross income in 2016 was $83,176. The trial court did not rely on the profit and loss statements for Chico Pools because it found Stephen included questionable expenses in those statements. That finding was supported by Tammy and Stephen's testimony. With regard to the formula the trial court applied, a

11

trial "court has broad discretion to select a valuation method that will most effectively achieve substantial justice between the parties as long as that method is within the range of the evidence presented." (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 636.) Tammy testified that the value of a pool service business was determined by multiplying the business's monthly gross income by 10 to 12. The trial court overruled Stephen's objection, stating that Stephen could cross-examine Tammy on her understanding. But Stephen did not question Tammy regarding the formula on cross-examination. And he did not challenge the asserted formula when he testified about the value of Chico Pools. Instead, he presented three ways of valuing Chico Pools, none of which appeared to be based on Chico Pools' income, and he did not say there were only three ways to properly determine value. Stephen's federal income tax return and Tammy's testimony constituted substantial evidence supporting the trial court's finding regarding the value of Chico Pools.

Stephen complains the trial court incorrectly found that Tammy operated Chico Pools for years. He asserts that Tammy only operated the business for one year and stopped working at Chico Pools in 2003.

Tammy started Chico Pools in 2002. She operated Chico Pools until sometime in 2003, personally performing administrative and pool-service work. Her testimony indicated that she continued to have personal knowledge about Chico Pools and the pool-cleaning business after she became a stay-at-home parent, and her testimony of value was based on her research regarding the value of pool-service businesses. The trial court did not abuse its discretion in crediting her testimony.

In his appellate reply brief, Stephen objects that Tammy was allowed to testify as an expert when she was not qualified to provide expert opinion, and an expert witness cannot present case-specific hearsay. Those objections were not raised in the trial court and are forfeited. (Evid. Code, § 353, subd. (a); *People v. Bolin* (1998) 18 Cal.4th 297, 321; *Estate of Odian* (2006) 145 Cal.App.4th 152, 168.)

12

III

Stephen also claims the trial court erred in concluding that his unilateral closing of Interlinx and sale of Hostverse violated the ATROs in the summons, and the trial court had no authority to assign the sale amount of Hostverse to him without an adjustment for net losses.

Four statutory ATROs take effect upon the filing of a petition for dissolution and issuance of the summons and upon personal service of the petition and summons or the respondent's waiver and acceptance of service. (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group) ¶ 5:51.) The ATROs are in effect until the final judgment is entered or the petition is dismissed or until further order of the trial court. (§ 233, subd. (a).) Among other things, the ATROs prohibit the parties from disposing of any property, whether community or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life. (§ 2040, subd. (a)(2)(A).)

The trial court found that Stephen closed Interlinx, a community property business, and sold Hostverse, an asset of Interlinx, for $22,500, without Tammy's agreement and in violation of the ATROs in the summons. Substantial evidence supported those findings. Stephen started Interlinx during the marriage. He testified Hostverse was an asset of Interlinx. He admitted in a pretrial brief that he closed Interlinx. He testified at trial that Hostverse was sold for $45,000, which was split between him and his partner. Tammy testified she did not have advance notice of the sale nor consent to it. There is no trial court order in the record that approved the closing of Interlinx or the sale of Hostverse. As remedies for the violations, the trial court ordered Stephen to hold Tammy harmless from any liability associated with Interlinx and Hostverse, it attributed the sum of $22,500 to Stephen, and it assigned to Stephen his claim of Interlinx losses in the total amount of $14,439. Attributing the $22,500 to

13

Stephen is similar to the restitution remedy awarded for the ATRO violation in *In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1103.

Stephen argues there was no evidence of a loss resulting from the sale of Hostverse. We need not decide that question because the ATROs and section 2040 do not limit the prohibition against disposing of property to instances of loss. (§ 2040, subd. (a)(2)(A).) Stephen does not cite any authority supporting his proposition that sale of property in violation of an ATRO must result in a loss to warrant a remedy.

Stephen appears to further argue that the sale of Hostverse was done in the normal course of business. But he does not cite any portion of the record to support such a factual assertion, and hence we do not consider the claim. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239-1240; *Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743.)

Citing section 1101, subdivision (g), Stephen also says it was punitive for the trial court to assign the full value of the community interest ($22,500) and disallow the net loss of $14,439 against the $22,500. He urges that the net loss should have been deducted from the $22,500 assigned to him. However, section 1101, subdivision (g) is not applicable. That statute provides: "Remedies for breach of the fiduciary duty by one spouse . . . shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs. The value of the asset shall be determined to be its highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court." Tammy did not request relief under section 1101, subdivision (g) for Stephen's conduct with regard to Interlinx and Hostverse, and the trial court's order was not based on breach of a fiduciary duty, but rather on Stephen's violation of the ATROs.

Stephen sought a credit of $14,439 for Interlinx losses for 2015 through October 2017, as shown in profit and loss statements. Tammy testified she should not be

14

responsible for any alleged losses related to Interlinx because Stephen closed the business without her knowledge or the trial court's approval. The trial court did not abuse its discretion. Moreover, the record supports rejecting Stephen's claim of net losses. The amount of net loss shown in the 2015 profit and loss statement was not consistent with the net loss amount shown in Stephen's 2015 federal income tax return. Stephen admitted the Interlinx profit and loss statement for 2015 included a $10,000 personal expense. He testified that Hostverse sold for $45,000 but the 2015 profit and loss statement showed only $22,500 in "Other Income" to account for the sale. And, as the trial court noted, Stephen reported a profit for Interlinx prior to the separation. All of the above casted doubt on Stephen's claim of net losses.

IV

Stephen further argues the trial court erred in finding that he could work an additional 10 hours per week at $20 per hour and imputing an additional $800 per month in income to him.

Parents are obligated to support their "minor children according to the parent's circumstances and station in life." (§ 4053, subd. (a).) "Both parents are mutually responsible for the support of their children." (§ 4053, subd. (b); see also § 3900.) "Each parent should pay for the support of the children according to the parent's ability." (§ 4053, subd. (d).) A trial "court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's [actual] income, consistent with the best interests of the children, taking into consideration the overall welfare and developmental needs of the children, and the time that parent spends with the children." (§§ 4058, subd. (b); see 4074 [article applies to family support]; *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1336-1337 [the trial court has discretion to substitute earning capacity for actual income in applying the guideline child support formula].) It may impute income to either parent based on the parent's earning capacity. (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 927; *In re Marriage of LaBass & Munsee, supra*,

15

56 Cal.App.4th at p. 1338 [the trial court may impute earning capacity if a parent is unwilling to work despite the ability and the opportunity to work].)  A supporting spouse's earning capacity is also a factor a trial court may consider in determining spousal support.  (§ 4320, subd. (c).)  We review a trial court's decision to consider a party's earning capacity for abuse of discretion.  (*In re Marriage of Paulin* (1996) 46 Cal.App.4th 1378, 1383.)

" ' " 'Earning capacity is composed of (1) the ability to work, including such factors as age, occupation, skills, education, health, background, work experience and qualifications; (2) the willingness to work exemplified through good faith efforts, due diligence and meaningful attempts to secure employment; and (3) an opportunity to work which means an employer who is willing to hire. [Citation.]' " ' " (*In re Marriage of Cohn, supra*, 65 Cal.App.4th at pp. 927-928.)

Stephen contends there was no evidence he could work an extra 10 hours a week. We disagree.  Stephen testified that at the time of the trial, he worked 24 to 30 hours a week at Swiss Link, Inc.  He subsequently filed an income and expense declaration stating that he worked 25 hours at Swiss Link, Inc. and 16 hours a week at Chico Pools. Chico Pools used the services of a subcontractor to service pools.  Stephen performed the administrative work for the business.  Tammy testified that, based on her experience in operating Chico Pools, the administrative work for Chico Pools required only 20 hours a month.  The trial court credited Tammy's testimony and found that the work at Chico Pools would take 4 hours a week or 20 hours a month, rather than the 16 hours a week that Stephen claimed.  Substantial evidence supported the trial court's finding that Stephen worked only 29 hours a week.

Tammy and Stephen's testimony and Stephen's resume and Linkedin profile established that Stephen had the ability to work -- he had marketable skills, 14 years work experience as a quality assurance manager/engineer, and experience operating various businesses -- and the opportunity to work, i.e., there was a substantial likelihood that he

16

"could, with reasonable effort, apply his . . . skills and training to produce income."
(*In re Marriage of Cohn, supra,* 65 Cal.App.4th at p. 930 [defining opportunity to work].)
Stephen's trial testimony established that he had not attempted to seek full-time
employment since February or March 2015, which was more than two years before the
trial. Earning capacity may be imputed when a party demonstrates a lack of willingness
to find full-time employment. (*In re Marriage of LaBass & Munsee, supra*, 56
Cal.App.4th at p. 1339; see *In re Marriage of Simpson* (1992) 4 Cal.4th 225, 232; *In re
Marriage of Regnery* (1989) 214 Cal.App.3d 1367, 1373.)

Stephen argues there was no evidence of a job available to him at $20 per hour.
He earned $14.40 an hour at Swiss Link, Inc. in 2017.[3] His last-filed income and
expense declaration showed he earned an additional average monthly gross income of
$2,200 from Chico Pools, which equated to about $110 an hour ($2,200 ÷ 20 hours). In
2013, the year prior to separation, Tammy and Stephen's joint federal income tax return
showed a total income of $57,491 primarily from business income or $27.64 per hour,
assuming 2,080 hours of work a year (52 workweeks a year and 40 work hours a week).
Stephen had 14 years of work experience as a quality assurance engineer. Tammy
submitted a printout from an online resource showing positions for senior quality
assurance engineers available in California in September 2017 and that the average salary
for a senior quality assurance engineer was $91,012 or $43.75 an hour, assuming 2,080
work hours per year. On this record, the trial court did not abuse its discretion in finding

---

[3] Stephen asserts in his appellate opening brief that his hourly rate at Swiss Link, Inc.
was $13.85. But the income and expense declaration he filed on November 29, 2017,
stated he worked 25 hours a week at Swiss Link, Inc. Copies of his paystubs from that
company showed he earned a monthly salary of $1,560. $1,560 ÷ 108.33 hours = $14.40
per hour.

Nothing in the record supports Tammy's appellate claim of commissions from Swiss
Link, Inc. and we do not consider commissions.

that Stephen had an opportunity to earn additional income at $20 per hour for a total monthly income of $4,560.

Stephen contends the trial court should have drawn inferences against Tammy because she did not call the vocational specialist she hired to testify at the trial. Tammy counters that because the vocational specialist had not assessed positions relevant to those Stephen had held, Tammy did not present the vocational specialist's testimony because the information she submitted was useless. We will not speculate about evidence not in the record before us, and Stephen has not shown trial court abuse of discretion.

Tammy argues the trial court should have imputed a minimum income of $7,750 to Stephen based on Chico Pools' gross income. We do not consider the claim because Tammy did not file a cross-appeal. (Code Civ. Proc., § 906; *Valentine v. Plum Healthcare Group, LLC* (2019) 37 Cal.App.5th 1076, 1090, fn. 4 (*Valentine*) [" ' "To obtain affirmative relief by way of appeal, respondents must themselves file a notice of appeal and become cross-appellants." ' "].)

V

Stephen next urges that when the trial court reduced temporary spousal support to $0, it should have done so retroactive to May 1, 2015 rather than August 1, 2017.

A

Tammy filed a petition for dissolution of marriage on December 4, 2014. She sought child and spousal support. On April 20, 2015, the trial court granted Tammy's request for an interim order of $3,000 per month in family support commencing on May 1, 2015. Its order stated, "Pending the completion of testimony and admission of evidence, the court announced its interim order, IT IS HEREBY ORDERED AS FOLLOWS: [¶] 1. Respondent-Husband is to pay Petitioner-Wife unallocated child and spousal support of $3,000 per month commencing on May 1, 2015, without prejudice. [¶] 2. The court reserves the right to allocate and alter the order at the conclusion of testimony, as well as determine any and all remaining contested

18

issues."  On August 27, 2015, the trial court filed an order that is identical in pertinent part to its prior interim order.

On August 1, 2017, Stephen filed a request for an order to change the August 27, 2015 child and spousal support interim order.  With regard to spousal support, he said the interim order was based on a period when his income was unusually high and he had since developed a consistent history of actual and lower income that should be used to determine support.  Tammy filed a response, asking the trial court to address the issues presented in Stephen's request at the trial.

Following the court trial, the trial court modified to $0 the temporary spousal support per month from August 1, 2017 to February 1, 2018.  It concluded the effective date of modification would be August 1, 2017, the date Stephen filed his request for order to modify.  It said the temporary support order filed August 27, 2015, could be modified, but not retroactively.

B

A temporary spousal support order may be modified at any time except as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate.  (§§ 3603, 3650, 3651, subd. (c)(1), 3653, subd (a); *In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1317-1318 [stating, in a case involving temporary child and spousal support, "a trial court lacks jurisdiction to retroactively modify a pendente lite support order to any date earlier than the date on which a proper pleading seeking modification of such order is filed, unless it specifically reserves jurisdiction to do so."]; see *S.C. v. G.S.* (2019) 38 Cal.App.5th 591, 599 [stating, in a case involving child support, "a trial court acts 'in excess of the court's jurisdiction' if it modifies support retroactive to any time before the filing of an obligor's modification motion"].)  "Section 3603 'makes no provision for "suspending" a spousal support order, or for modifying it retroactively beyond the date the underlying request for modification was filed.'  [Citation.]  'The filing date . . . establishes the outermost limit of

19

retroactivity.' " (*In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 638.)  An order modifying a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or to any subsequent date, except in circumstances inapplicable here.  (§ 3653, subd. (a).)  We review a trial court's decision regarding retroactivity under the abuse of discretion standard of review.  (*In re Marriage of Left* (2012) 208 Cal.App.4th 1137, 1152.)

The May 1 and August 27, 2015 temporary support orders are distinguishable from the temporary spousal support order in *In re Marriage of Freitas* (2012) 209 Cal.App.4th 1059, a case Stephen relies on.  In *In re Marriage of Freitas*, the trial court awarded the husband temporary spousal support and awarded the wife temporary child support on October 6, 2010, but reserved jurisdiction with respect to whether to amend the child and spousal support awards for the months of September and October 2010, giving the husband an opportunity to present evidence concerning the wife's income and stating that if the husband could prove the wife's representations regarding her income were inaccurate the trial court judge would retroactively amend the temporary support order.  (*Id.* at p. 1063.)

In contrast with the temporary support order in *In re Marriage of Freitas*, the May 1 and August 27, 2015 interim orders in this case do not mention retroactivity.  The trial court reserved its "right to allocate and alter the order at the conclusion of testimony," but it did not state that it reserved jurisdiction to retroactively amend the amount of family support.

The other cases Stephen cites are also inapposite.  *In re Marriage of Dick* (1993) 15 Cal.App.4th 144 involves an initial order awarding temporary spousal support, not an order modifying a temporary support award.  (*Id.* at pp. 158-159, 165-166.)  *In re Marriage of Mendoza v. Cuellar* (2017) 14 Cal.App.5th 939 involves a permanent spousal support order.  (*Id.* at p. 941.)  The wife in that case did not request temporary spousal support, and the appellate court noted that awards of temporary and permanent

20

spousal support are different.  (*Id.* at pp. 942-943.)  *In re Marriage of Spector* (2018) 24 Cal.App.5th 201 involved whether a trial court had inherent authority to sua sponte reconsider its own order to correct an error.  (*Id.* at pp. 204, 213-216.)  The trial court here did not act sua sponte to reconsider the temporary spousal support order.  It acted upon Stephen's request to modify the interim order.

Stephen filed a motion to modify the August 27, 2015 temporary spousal support order.  Under the circumstances of this case, the trial court could not modify its August 27, 2015 order to reduce spousal support payments that had accrued before Stephen filed his motion.  (§§ 3603, 4333.)  The trial court exercised its discretion to make its order modifying the August 27, 2015 order retroactive to the date Stephen filed his motion, as permitted under section 3653, subdivision (a), and Stephen has not demonstrated that the retroactivity order was an abuse of discretion.

Tammy argues the trial court should not have modified temporary spousal support as of the date Stephen filed his motion, asking us to reverse the retroactivity order because it has caused her undue hardship.  We do not consider her argument because she did not file a cross-appeal.  (Code Civ. Proc., § 906; *Valentine, supra,* 37 Cal.App.5th at p. 1090, fn. 4.)

## VI

In addition, Stephen challenges the trial court's permanent spousal support order.

## A

After applying the section 4320 factors, the trial court awarded Tammy $400 in permanent monthly spousal support.  Stephen objected that the trial court incorrectly stated that Tammy's income was $2,758 because Tammy testified her income was $3,207.  He also objected that the trial court incorrectly listed the number of federal exemptions and did not include a $70 health insurance payment by Stephen.  He argued the correct temporary and permanent spousal support should be zero.  With regard to permanent spousal support, he claimed Tammy's net spendable income after child

21

support was $3,321 and Stephen's was $3,462, and the $141 difference in their net disposable income made a $400 permanent support award improper. The trial court reassessed the section 4320 factors based on Tammy's increased income and the modified tax consequences and reaffirmed its ruling that Stephen would pay Tammy permanent spousal support in the amount of $400 a month.

B

"In a judgment of dissolution of marriage . . . , the court may order a party to pay for the support of the other party an amount, for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances as provided in" sections 4320 through 4326. (§ 4330, subd. (a).) Section 4320 sets forth the factors a trial court must consider in ordering spousal support. (*In re Marriage of Ciprari, supra,* 32 Cal.App.5th at p. 108.) Those factors include (a) the extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account "(1) [t]he marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment; [and] [¶] (2) [t]he extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties; [¶] (b) [t]he extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party; [¶] (c) [t]he ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living; [¶] (d) [t]he needs of each party based on the standard of living established during the marriage; (e) the obligations and assets, including the separate property, of each party; [¶] (f) [t]he duration of the marriage; [¶]

22

(g) [t]he ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party;  [¶] (h) [t]he age and health of the parties;  [¶]  (i) [a]ll documented evidence of any history of domestic violence . . . ;  [¶]  (j) [t]he immediate and specific tax consequences to each party;  [¶]  (k) [t]he balance of the hardships to each party;  [¶]  (l) [t]he goal that the supported party shall be self-supporting within a reasonable period of time . . . ;  [¶] (m) [t]he criminal conviction of an abusive spouse . . . ; [and]  [¶]  (n) [a]ny other factors the court determines are just and equitable."  (§ 4320.)

A trial court has broad discretion in making a spousal support order " ' "with the goal of accomplishing substantial justice for the parties in the case before it." ' "  (*In re Marriage of Ciprari, supra,* 32 Cal.App.5th at p. 108.)  " ' "In balancing the applicable statutory factors, the trial court has discretion to determine the appropriate weight to accord to each. [Citation.]  But the 'court may not be arbitrary; it must exercise its discretion along legal lines, taking into consideration the applicable circumstances of the parties set forth in [the statute], especially reasonable needs and their financial abilities.' " ' "  (*Ibid.*)  We review the trial court's order for abuse of discretion.  (*Id.* at p. 110.)  " ' "As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it." ' "  (*Ibid.*)

We discern no abuse of discretion by the trial court.  The trial court assessed the section 4320 factors in detail.  On appeal, Stephen does not challenge the trial court's evaluation of those factors save its findings regarding Tammy's actual income and Stephen's ability to pay.

The trial court initially found Tammy's income was $2,758 a month but later corrected that finding to state that Tammy's income was $3,207, a $449 increase.  It then reassessed the section 4320 factors and concluded that a permanent spousal support award of $400 was still appropriate.  It imputed $4,560 in income to Stephen.  It found that during the couple's 12-year nine-month marriage Tammy was unemployed,

23

dedicating herself to home and family to allow Stephen to grow his earning potential and operate his businesses; Tammy had little assets in comparison to Stephen's significant separate property assets; the couple had few debts; Tammy was maximizing her income based on her marketable skills whereas Stephen had ability and opportunity to work but was underemployed; and Tammy was struggling to maintain the marital middle-class standard of living. Substantial evidence supports the trial court's findings. The trial court did not abuse its discretion in finding that $400 in monthly spousal support from Stephen to Tammy was just and reasonable considering the section 4320 factors.

Stephen complains that with the $400 monthly spousal support award, the net spendable income for Tammy, as shown on the DissoMaster report attached to the trial court's statement of decision, would be greater than the net spendable income shown for him. But DissoMaster information should not be used to determine permanent spousal support because the purposes of temporary and permanent spousal support are vastly different, and in most cases the amounts ordered for each are different. (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 525-528; *In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 5, fn. 3.) DissoMaster is a computer program designed to "calculate temporary spousal support as provided by local rules for the ordinary case." (*In re Marriage of Olson,* at p. 5, fn. 3.) A trial court must consider the section 4320 factors and not the net spendable income shown on the DissoMaster program to fix permanent spousal support. (*In re Marriage of Olson,* at p. 5, fn. 3.) In any event, Stephen has not shown that in considering all of the section 4320 factors, the trial court abused its discretion in awarding permanent monthly spousal support of $400.

Stephen argues the permanent spousal support order was improper because substantial evidence does not support the finding that Chico Pools required only four hours of administrative work per week, or the imputation of additional income to Stephen. For the reasons we explained in part IV *ante*, the argument lacks merit.

24

# VII

Stephen further argues the trial court erred in allowing only one-half of his claim for reimbursement pertaining to his post-separation payment of a community debt.

Stephen sought reimbursement for post-separation payments he made on community debts, including $23,207 for losses on rental properties. The rental property losses were for the Magnolia Avenue and West Park Drive properties. The trial court found both were community property assets. It awarded the Magnolia Avenue property to Stephen at a net value of $72,295. It ordered the West Park Drive property to be sold because neither Tammy nor Stephen wanted that property. It ordered the net sale proceeds or the loss from the sale of the West Park Drive property to be divided equally between Tammy and Stephen. The trial court recognized that the losses associated with the Magnolia Avenue and West Park Drive properties were not included in its DissoMaster report, so it apportioned the losses as post-separation community debt. It credited Stephen one-half of that "community debt," i.e., $11,603.50.

Stephen argues the trial court properly allowed his claim for credit for rental property losses but the trial court should have entered the full amount of the losses ($23,207) in the Propertizer report. However, because his argument is not supported by legal analysis or citation to authority, it is forfeited. (*Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043, 1045, fn. 1; *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656 ["It is the appellant's responsibility to support claims of error with citation and authority; this court is not obligated to perform that function on the appellant's behalf."].) Stephen fails to show that crediting him his one-half share of the rental property losses was improper.

Tammy argues Stephen should not receive credit for rental property losses because those losses resulted from his claim of depreciation on his tax returns, his renting the properties at below market rates, and his unnecessary use of a property management company. Once again, we do not consider Tammy's claims of error because she did not

file a cross-appeal.  (Code Civ. Proc., § 906; *Valentine, supra,* 37 Cal.App.5th at p. 1090, fn. 4.)

## VIII

Tammy contends the trial court erred in allocating PayPal and eBay stocks. We do not consider her claim for relief because she did not file a cross-appeal. (Code Civ. Proc., § 906; *Valentine, supra,* 37 Cal.App.5th at p. 1090, fn. 4.)

## DISPOSITION

The judgment is affirmed.  Each party shall bear his or her own costs on appeal.

_____/S/_____

MAURO, J.

We concur:

_____/S/_____

RAYE, P. J.

_____/S/_____

BLEASE, J.